**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |  |
|---|---|---|
| BLOOM ENERGY CORPORATION, | § § § § § | CIVIL ACTION NO. 2:22-CV-101 |
| Plaintiff, | § § | |
| v. | § § § | **COMPLAINT** |
| PLANSEE SE and GLOBAL TUNGSTEN AND POWDERS CORP., | § § § § | 1. Correction of Inventorship 2. Declaratory Judgment of Invalidity (inventorship) |
| Defendants. | § § § § § | 3. Declaratory Judgment of Invalidity (derivation) |

COMPLAINT
1. Correction of Inventorship
2. Declaratory Judgment of Invalidity (inventorship)
3. Declaratory Judgment of Invalidity (derivation)
4. Declaratory Judgment of Unenforceability (inequitable conduct)
5. Declaratory Judgment of Unenforceability (patent misuse)
6. Declaratory Judgment of Invalidity (lack of written description and enablement)
7. Declaratory Judgment of Non-Infringement
8. Declaratory Judgment of No Misappropriation
9. Unfair Competition
10. Tortious Interference with Contract
11. Breach of Contract
12. Breach of Warranty
13. Violation of Racketeer Influenced and Corrupt Organizations Act
14. Violation of Sherman Antitrust Act

JURY TRIAL DEMANDED

**COMPLAINT**

## **INTRODUCTION AND NATURE OF THE CASE**

1.     Bloom Energy Corporation ("Bloom") hereby brings this action against Plansee SE ("Plansee") and Global Tungsten and Powders Corp. ("GTP") (collectively, "Defendants").   In particular, Bloom brings this action against Plansee SE seeking: (i) to correct the inventorship of U.S. Patent Nos. 8,753,785 (the "'785 patent"); 8,802,328 (the "'328 patent"); and 9,434,003 (the "'003 patent") (collectively, the "Patents-in-Suit") owned by Plansee; in the alternative, declaratory judgment of: (ii) invalidity of the Patents-in-Suit for improper inventorship; (iii) invalidity of the Patents-in-Suit under pre-AIA 35 U.S.C. § 102(f) derivation; (iv) unenforceability of the Patents-in-Suit due to inequitable conduct; (v) unenforceability of the Patents-in-Suit due to patent misuse; (vi) invalidity of the Patents-in-Suit for lack of written description; and/or for lack of enablement; and (vii) non-infringement of the Patents-in-Suit by Bloom.

2.     Bloom further brings claims against Defendants for (viii) declaratory judgment of no misappropriation; (ix) unfair competition; (x) tortious interference with contract; (xi) breach of contract; (xii) breach of warranty; (xiii) violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act; (xiv) violations of the Sherman Antitrust Act; and (xv) for such other relief as the Court deems just and proper.

3.     Bloom requests the correction of inventorship, declaratory judgment, and other relief because Defendant Plansee converted Bloom's trade secrets and used such trade secrets to improperly obtain patents whose inventorship should have, at the least, included Bloom employees, some or all of whom had a duty to assign any such intellectual property interest to Bloom.  Bloom further files this complaint seeking declaratory judgment of no misappropriation to fully and finally resolve Defendants' ████████████████████████████████ that Bloom has misappropriated Defendants' know-how and confidential information.  Further,

Bloom brings additional causes of action against Defendant Plansee and Defendant GTP who have acted in concert to commit predicate acts of economic espionage, wire fraud, mail fraud, extortion, and conspiracy, forming a RICO enterprise with the purpose of converting Bloom trade secrets and extorting Bloom for property, and for violation of the Sherman Antitrust act for its attempts to monopolize Bloom's interconnect supply chain.

## PARTIES

4.      Plaintiff Bloom is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Sunnyvale, California.

5.      On information and belief, Defendant Plansee SE is a corporation organized and existing under the laws of Austria, with its principal place of business in Reutte, Austria.

6.      On information and belief, Defendant Global Tungsten & Powders Corp. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Towanda, Pennsylvania.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction over the federal claims in this action under 28 U.S.C. § 1331, 28 U.S.C. § 1338, 28 U.S.C. § 2202, 15 U.S.C. § 22, and 18 U.S.C. § 1964(a).

8.      This Court has supplemental subject-matter jurisdiction over the state-law claims in this action under 28 U.S.C. § 1367.  The state-law claims are part of the same case or controversy as the federal claims.

9.      An actual and justiciable controversy exists between Bloom and Plansee as to the inventorship, validity, infringement, and enforceability of the claims of the Patents-in-Suit. ■

██████████████████████████████

██████████████████████████████

██████████

10.     This Court has personal jurisdiction over Defendants under, inter alia, Federal Rule

of Civil Procedure 4(k)(1), 18 U.S.C. § 1965, and 15 U.S.C. § 22.  This jurisdiction results from,

inter alia, Defendants' systematic and targeted contacts with the United States, including their

contacts and business relationships with Bloom.

11.     In addition, or in the alternative, this Court has personal jurisdiction over Plansee

under Fed. R. Civ. P. 4(k)(2), based on Plansee's continuous, systematic, and targeted contacts

with the United States, including its contacts and business relationship with Bloom.

12.     On information and belief, Plansee has systematic and continuous business contacts

with residents of Texas.  On information and belief, Plansee has a longstanding business

relationship with Texas Instruments, a Texas corporation headquartered in Dallas, Texas, "that

designs, manufactures and sells semiconductors and various integrated circuits worldwide.  Texas

Instruments has been a customer of Plansee for many years now." *See Supplier Awards: Plansee*

*honored     three     times*,     Plansee-Company-News     (June     22,     2020),

https://www.plansee.com/en/unternehmen/news/2020/plansee---ein-preisgekroentes-team.html

(last visited Mar. 28, 2022).

13.     On information and belief, Defendants knowingly and purposely placed their

products into the stream of commerce in Texas via Bloom's marketing and sale of SOFCs to

companies located in Texas.

14.     Plansee has systematic, continuous, and targeted contacts with the United States,

including Plansee's continuous work with Bloom, located in the United States, from at least 2002

to 2020.  Plansee supplied interconnects, endplates, and blanks (collectively, "ICs") to Bloom, which were placed in fuel cells sold throughout the United States.  Plansee also worked continuously with GTP, located in the United States, from at least 2008 to the present day.  Plansee has obtained multiple U.S. Patents, which are the subjects of Plaintiff's claims.  Plansee has licensed its U.S. Patents in the U.S. to at least Bloom and on information and belief, GTP, and has also asserted its U.S. Patents against at least Bloom.

15.     This Court has personal jurisdiction over GTP because GTP has systematic and continuous business contacts in Texas. On information and belief, GTP uses Dynalloy Industries, Inc., "[s]trategically located in Houston, Texas," to distribute GTP's thermal spray powders, with GTP producing such specialized powder grades for thermal spray applications until at least some time in 2022. *See* GTP, *GTP and Dynalloy Announce Distribution Partnership*, https://www.globaltungsten.com/en/company/news/News/detail/gtp-and-dynalloy-announce-distribution-parntership.html (Feb. 1, 2016); Powder Metallurgy Review, *GTP to Discontinue Thermal Spray Powder Line*, https://www.pm-review.com/gtp-to-discontinue-thermal-spray-powder-line/ (Nov. 8, 2021).

## FACTUAL ALLEGATIONS

## I.     BACKGROUND

### A.     Bloom was Founded on Innovation—Its Mission: to Make Clean Energy Affordable For Everyone

16.     Bloom, a Delaware corporation with its headquarters in California, is a leader and innovator in the field of clean energy.  Bloom's roots lie in NASA's Mars Exploration program, where founder and CEO Dr. KR Sridhar and his team built a fuel cell capable of producing air and fuel using electricity generated by a solar panel, with a vision of one day being able to support life on Mars.  But realizing their technology could have an even greater impact here on Earth, Dr.

Sridhar and his team sought to bring their energy technology to the public to uniquely address both the causes and consequences of climate change by lowering carbon emissions and enabling energy resilience. Today, Bloom is one of the leading manufacturers and suppliers of solid oxide fuel cells ("SOFC"), which allow customers to utilize base load low-carbon or zero-carbon electricity independent of the traditional power grid.

17.     A fuel cell is an electrochemical device that converts the chemical energy of a fuel and oxidizing agent into electricity. Individual fuel cells are composed of a negative electrode (an anode) and a positive electrode (a cathode) separated by an electrolyte membrane. The anode is supplied with fuel (*e.g.* natural gas, biogas, or hydrogen) and the cathode is supplied with an oxidizing agent (ambient air). Operating at high temperatures, the oxygen ions are conducted through the electrolyte membrane to the anode plate, creating a charge differential across the two plates, which generates electricity. An SOFC is a type of fuel cell that uses a unique electrolyte: a solid, ceramic material.



18.     In order to achieve a sufficiently high voltage for practical applications, several of these cells are stacked together using interconnector plates, where fuel runs through one side of the interconnector plate and an oxidizing agent through the other.



19.     Interconnector plates have ribs on either side, which are designed to facilitate even distribution of the fuel and oxidizing agents and the contact points between each rib that facilitate the flow of electricity.  At both ends of each fuel cell stack, there are plates with ribs on only one side of the plate, called "endplates."  A fuel cell stack will have a fuel endplate on one end, and an oxidizing endplate on the other end.

20.     Originally called "Ion America," Bloom Energy was founded in 2001 with a mission: to make clean, reliable energy affordable for everyone on Earth.  While small in size, Bloom assembled a team of some of the best and brightest engineers and innovators in the field of fuel cell development.  To achieve its goal of affordable green energy, Bloom needed to develop new technologies that would be both cleaner and cheaper than the existing energy grid.  At its

origin in the early 2000s, Bloom's mission was visionary: It was one of the first of its kind to venture into what would become "green tech."

21.     From the beginning, Bloom's small team worked tirelessly to innovate.  The technology quickly developed from concept, to prototype, to product as major technological challenges were solved and Bloom's systems became more powerful, more efficient, more reliable, and more economical.  In early 2006, Bloom shipped its first 5kW field trial unit to the University of Tennessee at Chattanooga.  After two years of successful field trials in Tennessee, California, and Alaska, in July 2008 Bloom shipped the first commercial (100kW) SOFCs to Google.

22.     Despite the successful proof of concept, ████████████████████████████ ████████████████████████████████████████.

23.     Consequently, Bloom set its sights on continuing to bring down the cost of its product.  Bloom knew that reducing material and manufacturing costs was essential to providing affordable clean energy to its customers.

**B.      The Early (2002-2008) Bloom-Plansee Relationship**

24.     In its developmental years, Bloom focused its efforts on innovating and developing its core technologies to bring SOFCs to market.  ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████

25.     During the early development of its first product, ████████████████████ ████████████████████.  When Bloom first approached Plansee ████████████, this was a nascent field.  ████████████████████████████████████████.

26.   ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ During this period,

Bloom and Plansee's business relationship was focused on innovation and growth.

27.   Consistent with Bloom's mission of bringing affordable green energy to the public,

Bloom continued to innovate through the early 2000s as part of its goal ████████████

████████████████████████████. During this time, Bloom realized that

█████████████████████████████. Unlike Bloom, however, Plansee

had little incentive to lower its costs ██████████████████████████

███████████████████████████████████████████████████

████████████

28.   ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

29.   In 2008, Bloom passed a major milestone with the sale of its first Energy Server to

Google.  But alongside having demonstrated the viability of its SOFCs, ████████████████

█████████████████████████████ to ensure the competitiveness of its clean energy in

many markets.

30.   ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████

31.   ████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

In the best case, Plansee had been less than efficient with its IC manufacturing and passed off significant costs to Bloom; in the worst case, it had taken advantage of Bloom with exorbitantly high pricing.

     **C.**    **The Bloom-Plansee/GTP Relationship from 2008 and Onward**

          **1.**    **Bloom's** ███████████████████████
███████████

32.   Driven by the goal of affordable power, Bloom also sought to lower its costs through innovation. ████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

33.   ████████████████████████████████████████

████████████████████████   Although single-press, single-sinter processes (hereafter, "SPSS") were known ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

34.      By early 2008, after years of research and development, Bloom believed it was

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

35.      █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

**2.**      ███████████████████████████████████

36.      █████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

37.      █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████

38.  ████████████████████████████████████████

████████████████████.  ██████████████████████

████████████████████████████████████.  To the

contrary, ████████████████████████████████████

████████████████████████████████████████████

██████████████.

39.  The second pressing of the traditional interconnector process provided a greater

angle to the ribs ██████████████████████████████

████████████████████████████████████████.

40.  ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████.

41.  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████.

42.  ████████████████████████████████████████

████████████████████████████████████████████

Messrs. Kraussler and Venskutonis then used this confidential information to file for the patent

applications that eventually issued as the '735, '328, and '003 patents.  Exh. 2-4.

43.  ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████.

44.     It was only after several years of research and development that Bloom finally was

able████████████████████████████████████████████████████████

████████████████████████████████████████████—only for

these designs to later be disclosed in Plansee's patents.

**3.     Plansee Used Bloom's █████████████ in Filing for the '735, '328, and '003 Patents.**

45.     █████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ Plansee filed

the Austrian application GM 794/2009—the application to which the '328 and '785 patents claim

priority. ████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████ *See* Exh. 10; Section I.C.6, *infra*.

46.     Shortly after filing the Austrian GM 794/2009 application in December 2009,

Plansee filed related patent applications claiming priority to the GM 794/2009 ████████

███████████████████████████████████████████████████████████

████████████

47.     Plansee filed a Taiwanese application on November 30, 2010 (Taiwan Patent

Number 201130585A), a Canadian application on December 8, 2010 (Canada Patent Number

2724350A1), and a Japanese application on December 10, 2010.

48.   ████████████████████████████████████████

████████████████████████

49.   Not only did Plansee convert for itself Bloom's proprietary, confidential information and use it to file patent applications that eventually issued as the Patents-in-Suit, but on information and belief, Plansee strategically filed the patent applications ███████████ ████████████████████

50.   As discussed below, Plansee would later use these patents in its various attempts to demand licenses from Bloom's manufacturers.

51.   Notably, Plansee also filed U.S. Appl. No. 13/435,762, which later issued as the '003 patent in 2012. ████████████████████████████.

52.   The '003 patent claims priority to Austrian Pat. Appl. No. 2002AT-U00514, which was filed in Austria in August 2002.

53.   As further detailed below, ████████████████████████████ ███████████, Austrian Pat. Appl. No. 2002AT-U00514 and its related family members (including U.S. counterparts) all clearly disclosed a ***two-stage*** pressing operation (*i.e.*, a double pressing process).

54.   The '003 patent family of patents, apart from the '003 patent itself, issued from applications filed between 2002 and 2005, including U.S. Pat. Appl. No. 10/533,560, filed May 20, 2005.  Each of these patent applications highlighted the importance of a *second* pressing and sintering step, and disparaged a single press and sintering process, as they provide for structures with density and homogeneity that would be insufficient for use in fuel cell ICs.  Significant emphasis was placed on maintaining the density of the manufactured IC during prosecution that would be achieved with a two-stage pressing process, as opposed to a single-pressing process.

55.   ██████████████████████████████████████████████

██████████████████████   On information and belief, Plansee's employees converted Bloom's

confidential information to apply for at least the subject matter that issued as the claims ██

████████████████████████████████████████████████████████

██████████████████████

### 4.   Plansee's Efforts to License Its Patents To Bloom and Bloom's Other IC Suppliers

56.   While Bloom sought to reduce its costs through innovation ████████████████

█████████, Plansee began to engage in various anticompetitive actions in order to maintain higher

prices for its ICs.  Instead of innovating to compete with other IC suppliers, Plansee sought to

monopolize Bloom's supply of ICs.

57.   ██████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████.

58.   ██████████████████████████████████████████████

██████████████████████████████████████████

59.   ██████████████████████████████████████████████

██████████████████████████████████████████

60.   ██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

61.   ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

62.    ████████████████████████████████████████████

████████████████████████

63.    ████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

64.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

**5.    Plansee's Production of Substandard, Defective ICs**

65.    Although Bloom was concerned with Plansee's actions ████████████

████████████████████████████████, Bloom did not want ████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

66.    Bloom was willing to work with Plansee and GTP ████████████████

████████████████████████████████████████████. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████Defendants' licensing overtures appeared to wane

beginning in 2013 to 2014.

67.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ A higher ASRD correlates to a higher electrical resistance in the

SOFC, which may result in a power decrease within the system. ██████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

68.      ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

69.      As the root cause and impact was not immediately apparent, ████████████

██████████████████████. ██████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████ During this entire timeframe, GTP did little to identify and

remedy the issue and ████████████████████████████████████ to help determine if GTP

processes had changed, which might have created the issue.

70.      On January 8, 2021, approximately two months after ████████████████████

██████████████████, GTP sent Bloom a demand letter ████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████

71.      GTP's actions were retaliatory and in response to Bloom's ████████████
████████.  In short, GTP was—despite ██████████████████████████████████
simply seeking a final windfall from its former customer.  It was clear through this and GTP's
subsequent demand letters that GTP's intent was ██████████████████████████
████████████████

72.      █████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██

73.      █████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████

74.      Defendants' exchanges with Bloom reflect Defendants' failure to engage in good
faith negotiations with Bloom regarding the alleged dispute between the Parties.  Instead,
Defendants' communications reflect that Defendants have disregarded Bloom's good faith
attempts to remedy the core issue that prevent Bloom's ████████████████████████
████; instead, they focus on Defendants' attempt to collect a final toll with their spurious claims
of infringement of patents whose inventions originated with Bloom itself.

75.      In contrast, GTP's substandard products caused significant damage to Bloom. ██
██████████████████████████████████████████
██████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████ As a direct consequence of GTP's breaches, Bloom

suffered significant damages ████████████████████████.

**6.** ████████████████████████████

76. ████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████

77. ████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████

78. ████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████

79. ████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████

80.   ███████████████████████████████████████████

████████████████████████████████████████████████████

## II.   THE PARTIES' AGREEMENTS

81.   ███████████████████████████████████████████

████████████████████████████████████████████████████

In an attempt to continue a working relationship despite Plansee's insistence that ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████.

82.   ████████████████████████████████████   Bloom

Energy Corporation entered into ███████████████████████████

██████████████.

83.   Pursuant to the ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

84.   ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



85.     Pursuant to █████████████████████████████████████████

86.     ████████████████████████████████████████

87.     ████████████████████████████████████████
████ .

88.     ████████████████████████████████████████

89.     ████████████████████████████████████████

90.     ████████████████████████████████████████

91.     ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

92.      ████████████████████████████████████

████████████████████████████████████████████

██████████████████████

93.      ███████████████████████████████  As explained

above, the ASRD value provides a means of assessing the lifespan of an SOFC.  Therefore, while

SOFCs may perform similarly at their beginning of life, an SOFC with a high ASRD value may

have a shorter lifespan than one with a lower ASRD.

94.      ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

## III.    THE PATENTS-IN-SUIT WERE FRAUDULENTLY PROCURED

95.      As discussed above, Bloom invested considerable time, skill, and resources in

developing ██████████████████████.  As a part of this process, Bloom

engineers, ███████████████████████████████████████████

███████████████████████████████████████████████

96.      Further, as discussed above, Bloom ███████████████████████

████████████████████████████████ to Plansee.

97.      ███████████████████████████████████████████████

███████████████████████████████████████

A.      **The '785 and '328 patents were Fraudulently Procured**

98.      Messrs. Kraussler and Venskutonis then took the information ████████████████████

██████████ used it to file for the Austrian Pat. Appl. No. AT7942009U, the priority application

of the '785 and '328 patents that ████████████████████████████████.

99.      On information and belief, Messrs. Kraussler and Venskutonis did not invent the

invention disclosed and claimed in Austrian patent application No. AT7942009U or the'785 and

'328 patents without, ████████████████████████████████████

100.      Thus, at least Mr. Couse should be listed as a co-inventor on the '785 patent and

'328 patent.

101.      On information and belief, Messrs. Kraussler and Venskutonis both knew that at

least other Bloom engineers, including Mr. Couse, should be listed as a co-inventor of the '785 the

'328 patents.

102.      Yet Messrs. Kraussler and Venskutonis signed and submitted declarations

(collectively, "Inventor Declarations") to the United States Patent and Trademark Office—which

excluded Mr. Couse as a co-inventor—identifying themselves and Marco Brandner, Stefan

Gerzoskovitz, and Alexander Leuprecht as the sole inventors of the '785 and '328 patents.  Exhs.

5 and 6.

103.     The signed Inventor Declarations, *supra*, ¶ 102, submitted to the United States Patent and Trademark Office constitute inequitable conduct during the prosecution of both the '785 and '328 patents.

104.     On information and belief, Messrs. Kraussler and Venskutonis intended for the United States Patent and Trademark Office to consider and rely on their Inventor Declarations as a material fact in order to grant the '785 and '328 patents.

105.     The United States Patent and Trademark Office did rely on the Inventor Declarations in granting the '785 and '328 patents.

106.     ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

The patents' shared specification even discloses the following: "If the shaped part is designed outside the limits defined according to the invention, the density and homogeneity decrease significantly, and therefore it is no longer ensured that the shaped part can be produced by a single-stage pressing-process." '785 patent at Column 3:1-5; '328 patent at Column 3:3-7.

107.     Further, during prosecution of U.S. Pat. Appl. No. 12/969,067, which later issued as the '785 patent, Plansee highlighted the importance of geometries to patentability in remarks submitted on January 13, 2014, in response to an office action that lead to subsequent approval of the '785 patent: "With respect to these established geometry requirements, there are numerous geometrical parameters of such interconnectors which could be changed.  It is not immediately obvious if, and which, changes to the geometry could lead to improved pressing characteristics and still provide low flow resistance and low electrical resistance." *See* Response to Office Action July 23, 2013 at 6.

**B.     The '003 patent was Fraudulently Procured**

108.      Mr. Kraussler also took the information ███████████████ to file U.S. Pat.
Appl. No. 13/435,762, which later issued into the '003 patent.

109.      ████████████████████████████████████████.

110.      To the extent the '003 patent claims an SPSS process, on information and belief,
Mr. Kraussler could not have invented the '003 patent's claimed invention without ███████
█████████████████████████.

111.      Thus, at least Mr. Couse should be listed as a co-inventor on the '003 patent.

112.      On information and belief, Mr. Kraussler knew that at least Mr. Couse should be
listed as a co-inventor of the '003 patent.

113.      Yet Mr. Kraussler signed and submitted a declaration ("'003 Inventor Declaration")
to the United States Patent and Trademark Office—which excluded Mr. Couse as a co-inventor—
identifying himself and Gebhard Zobl, Wolfgang Glatz, and Robert Oberbreyer as the sole
inventors of the '003 patent.  Exh. 7.

114.      The signed '003 Inventor Declaration submitted to the United States Patent and
Trademark Office constitutes inequitable conduct during the prosecution of the '003 patent.

115.      On information and belief, Mr. Kraussler intended for the United States Patent and
Trademark Office to consider and rely on their Inventor Declarations as a material fact in order to
grant the '003 patent.

116.      On information and belief, the United States Patent and Trademark Office did rely
on the '003 Inventor Declaration in granting the '003 patent.

117.     The '003 patent is a continuation of U.S. Patent Application 10/533,560, which was later issued as U.S. Patent Number 8,173,063.  Both the '003 and '063 patents claim priority to Austrian Patent Application AT1542002U filed on August 1, 2002.

118.     Plansee filed the PCT Application AT03/00217 on July 30, 2003 and nationalized that application to Australia, Austria, Canada, Europe and Spain.  The nationalized applications were published between 2004 and 2006.

119.     ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

120.     For the '003 patent, Plansee claims priority to the Austrian Patent AT1542002U filed on August 1, 2002 which only discloses as its alleged invention, a double-press process.

121.     ███████████████████████████████████████████████

██████     On information and belief, to the extent the '003 patent claims 1 and 10 may be infringed by an SPSS process or IC created using an SPSS process, Plansee intentionally drafted the claims of the '003 patent to capture a SPSS process despite the fact that all the previously issued claims of patents in the '003 patent family exclusively claimed a double-press process and each of the patents in the '003 patent only disclose an invention relating to a double-press process.

122.     Claim 1 of the '003 patent was amended in prosecution to add, amongst others, the underlined text:

> performing the pressing with parameters of the powder press such that, after sintering, the interconnector has a substantially uniform density throughout the basic body and the elevations, and the density is sufficient to render the interconnector suitable for use in a solid oxide fuel cell.

November 30, 2012 Response to Non-Final Rejection at 3.

123.     To the extent that by adding "the density [of the interconnector] is sufficient to render the interconnector suitable for use in a solid oxide fuel cell," to claim 1 of the '003 patent, the scope of that claim was broad enough to cover ████████████████████████████ ████, the claim was improperly broadened to encompass undisclosed subject matter. ████ ████████████████████████████████████████████ ████ is not supported by the specification.

124.     It was only after Plansee, ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ "density [] sufficient to render the interconnector suitable for use in a solid oxide fuel cell" ████ ████████████████████████

125.     The '003 patent, which is a continuation of U.S. Pat. Appl. No. 10/533,560, which was filed on May 20, 2005.  Notably, the '560 application was filed well before Plansee ████ ████████████████████████████ Bloom.  As such, the '560 application does not contain a written description that supports the "density [] sufficient to render [an] interconnector suitable for use in a solid oxide fuel cell," such that one of ordinary skill in the art would have understood the named inventors of the '003 patent to have possession of the claimed inventions in at least Claims 1 and 10 of the '003 patent.

126.     ████████████████████████████████████████████ ████████ the specification of the '003 patent does not enable a person skilled in the art to make or use the invention with an SPSS process without undue experimentation.  Thus, Independent Claims 1 and 10 of the '003 patent are also invalid for lack of enablement under 35 U.S.C. § 112.

127.     Further supporting the lack of written description and lack of enablement of the '003 is the fact that Werner H. Stemer, who was counsel for defendants before the Board during prosecution, ███████████████████████████████████, represented during the Oral Argument emphasizing the importance of a two press process and the density achieved as a result of having a second step, resulted in the issuance of the '560 Patent Application to US Patent 8,173,063.

128.     Plansee did not appreciate the use of a SPSS process (as opposed to a double-press process) until ████████████████████████████████████████ ████.

129.     On information and belief, Plansee used ████████████████████ in the prosecution of the '003 patent to apply for claims covering an SPSS process, while maintaining the priority date of the earlier patents.

130.     Claim 1 and Claim 10 of the '003 patent reflect new matter added to the invention that was invented at least in part by Bloom engineers.

## IV.    DEFENDANT'S MISUSE OF THE PATENTS-IN-SUIT

131.     As discussed above, Plansee obtained the Patents-in-Suit through fraud and inequitable conduct.  Plansee converted Bloom's IP by obtaining patents on Bloom's IP, which purported to give Plansee patent rights over Bloom's IP.

132.     On information and belief, Plansee knew its Patents-in-Suit were obtained through fraud and inequitable conduct.  Thus, Plansee knew its patents were invalid and unenforceable.  On information and belief, Plansee also knew and intended to convert Bloom's IP by filing the patent applications that eventually led to the issuance of the Patents-in-Suit.

133.     Knowingly using the IP converted from Bloom, and under the guise of a U.S. Patent's presumption of validity, Defendants ████████████████████████████████ under the fraudulently obtained Patents-in-Suit.

134.     Defendants have sent demand letters seeking royalties and licenses ████████ ████████████████████████████ Defendants have also sent demand letters to Bloom ██████████████████████████████████

135.     ████████████████████████████████████████████ ██████████████████████████████████████████ While such a conclusion is inherently suspect, it also comes as no surprise given that Plansee crafted the Patents-in-Suit using Bloom's own IP and with the intent to target Bloom's ICs. ████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████

136.     ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ creates an actual and justiciable controversy with respect to the inventorship, invalidity, non-infringement, and unenforceability of the Patents-in-Suit.

137.     ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

███████████████████████████ Plansee and GTP knew or should have known of the

breadth of the granted claims because Plansee had converted Bloom's IP in order to create these

patents ███████████████████████.

## COUNTS

### I.      COUNT I: CORRECTION OF INVENTORSHIP UNDER 35 U.S.C. § 256

138.      Bloom incorporates herein the allegations of ¶¶ 1-137 and 166-438.

139.      An actual and justiciable controversy exists between Bloom and Plansee

concerning the Patents-in-Suit.

### A.      Correction of inventorship for the '785 and '328 patents

140.      As discussed above, Plansee converted ████████████ in the '785 and '328

patents ██████████████. On information and belief, at least Messrs. Wolfgang Kraussler

and Andreas Venskutonis ████████████████████████████████

████████████████████████████████████████

████████████████

141.      ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ The

earliest priority date for the '785 and '328 patents is December 15, 2009, which is the filing date

of Austrian Pat. Appl. AT7942009U, to which the '785 and '328 patents claim priority.

142.      Mr. Couse contributed in a significant manner to the conception of the '785 and

'328 patents.  Mr. Couse ████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████.

143.      Mr. Couse's contribution to the Patents-in-Suit is not insignificant in quality.  ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

144.      These concepts of ████████████████████████████████████

████████████████████████ are reflected in the core of the claimed subject matter of the '785

and '328 patents.  For example, in relevant part the claims of the '785 and '328 patents recite:

- <u>'785 patent</u>: "having two inclined side flanks extending from said end contour of
  said elevation, via rounded corner portions having a radius r and r′, respectively,
  into curved portions having a radius R and R′, respectively, with a transition there
  between having a tangent with an angle of inclination α and α′, respectively, with
  regard to said surface contour lying in a range of 95° to 135°" Claim 1.

- <u>'328 patent</u>: "having two inclined side flanks extending from the end contour of the
  elevation, via rounded corner portions, into curved portions having a radius R and
  R′, respectively, and merging into the surface contour of the basic body; and the
  radius R and R′ lying in a range from 0.15 to 1 mm and a ratio of the radius R and
  R′ to the height h (R:h, R′:h) lying in a range from 0.5 to 1" Claim 1.

145.      Mr. Couse did not merely explain well-known concepts or the current state of the

art to Messrs. Kraussler and Venskutonis. ████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████   Bloom's technology was state of the art and one

of the first of its kind as no precious metals, corrosive acids, or molten materials were used to make

Bloom's fuel cells.

146.     Messrs. Kraussler and Venskutonis could not have, and did not conceive of ██

███████████████████████████   without reliance on Mr. Couse's prior conceptions and

contributions.

147.     Moreover, as detailed further below in Section I.B. regarding the inventorship of

the '003 patent, on information and belief,████████████████████████████████

██████████████████████████████████   Plansee did not conceive that an SPSS

process could be used to form an IC that would be suitable for use in a fuel cell.

148.     For the above reasons, Bloom employees, including at least Mr. Couse, are

inventors of the '785 and '328 patents.  The '785 and '328 patents must be corrected under 35

U.S.C. § 256 or are otherwise invalid under 35 U.S.C. § 102(f).

**B.    Correction of inventorship for the '003 patent**

149.     As discussed above, Plansee also converted the SPSS process, ████████████

█████████████████████████.

150.     ████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████

151.     Mr. Couse contributed in a significant manner to the conception of the '003 patent

and Mr. Couse's contribution to the Patents-in-Suit was not insignificant in quality.  ████████████



Whereas the state of the art—and the '003 Family—disparaged the SPSS process because they were unable to achieve the same density and density homogeneity as a double-press process,

153.     These concepts are reflected in the core of the claimed subject matter of the '003 patent, which recites:

- '003 patent: "performing the pressing with parameters of the powder press such that, after sintering, the interconnector has a substantially uniform density throughout the basic body and the elevations, and the density is sufficient to render the interconnector suitable for use in a solid oxide fuel cell." Claim 1.

154.     Mr. Couse did not merely explain well-known concepts or the current state of the art to Mr. Kraussler.

155.     On information and belief, Plansee had not discovered how to use the SPSS process to create an "interconnector [that] has a substantially uniform density throughout the basic body and the elevations, and the density is sufficient to render the interconnector suitable for use in a solid oxide fuel cell" before                                             .

156.     Notably, all the patents in the '003 patent family—excluding the '003 patent— (collectively, "the '003 Family") issued from applications filed between 2002 and 2005.  And all

the patents in the '003 Family were directed to a two-step pressing process, and specifically disparaged the use of a SPSS process.  Indeed, Plansee still used ███████████████████ ████████████████████████.

157.      Therefore none of the patents in the '003 Family even contemplated the SPSS process as now ████████████████████████████ before ███████████████████ ████████████████.

158.      Plansee had little incentive to develop the SPSS process ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████.

159.      Notably, the claims of the '003 patent that ████████████████████████████ were not filed until 2012—████████████████████████████████████ ████████████████████████.

160.      ████████████████████████████████████████ and is entitled to a priority date of 2002 from its 2002 Austrian priority patent filing, even though no members of the '003 Family disclose a two-step pressing process.  ████████████████████████████ ████████████████████████ the alleged invention was first appreciated by Mr. Couse ████████████████████████████████████████████ ████████████████████████████████████████.

161.      ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████.

162.     For the above reasons, Mr. Couse is an inventor of the '003 patent.  The '003 patent must be corrected under 35 U.S.C. § 256 or is otherwise invalid under 35 U.S.C. § 102(f).

163.     Bloom has standing to bring this claim at least because Plansee has accused Bloom of infringing the Patents-in-Suit, and Bloom has suffered and will continue to suffer injury in fact if Plansee is permitted to maintain its accusations despite Bloom's employee—Mr. Couse—being an inventor of the Patents-in-Suit.

164.     ████████████████████████████████████████████████████
███████████████████████████.

165.     Pursuant to 35 U.S.C. § 256, Bloom seeks a judgment that Mr. Couse is an inventor of each of the Patents-in-Suit and an order instructing the Patent Office to correct the Patents-in-Suit to properly include Mr. Couse as an inventor.

## II.     COUNT II: DECLARATORY JUDGEMENT OF INVALIDTY OF THE PATENTS-IN-SUIT FOR IMPROPER INVENTORSHIP

166.     Bloom incorporates herein the allegations of ¶¶ 1-165 and 172-438.

167.     An actual and justiciable controversy exists between Bloom and Plansee concerning the Patents-in-Suit.

168.     ████████████████████████████████████████████████████
███████████████████████████████    ███████████████
████████████████████████████████

169.     As discussed, Mr. Couse is an inventor of the Patents-in-Suit and should be a named inventor on each of the Patents-in-Suit.

170.     Under pre-AIA 35 U.S.C. § 102(f), non-joinder of an actual inventor renders a patent invalid, unless it can be corrected.  *Egenera, Inc. v. Cisco Sys.*, 972 F.3d 1367 (Fed. Cir. 2020) ("[C]ourts have historically held that if a patent does not reflect its true inventorship, it is

invalid") *citing Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349–50 (Fed. Cir. 1998). The Patents-in-Suit are thus invalid if they do not name Mr. Couse as an inventor. But an error of omitting inventors "shall not invalidate the patent in which such error occurred if it can be corrected as provided in [35 U.S.C. § 256]."

171.     For the above reasons, to the extent this Court determines that inventorship of the Patents-in-Suit cannot be corrected under 35 U.S.C. § 256, such patents are nevertheless invalid. Accordingly, if not corrected, Bloom seeks a declaratory judgement under at least 28 U.S.C. §§ 2201 & 2202 that the Patents-in-Suit are invalid.

### III.     COUNT III: DECLARATORY JUDGEMENT OF INVALIDITY OF THE PATENTS-IN-SUIT UNDER 35 U.S.C. § 102(F)

172.     Bloom incorporates herein the allegations of ¶¶ 1-171 and 179-438.

173.     An actual and justiciable controversy exists between Bloom and Plansee concerning the Patents-in-Suit.

174.     ████████████████████████████████████████████

████████████████████████████████     ██████████████

████████████████████████████████

175.     As discussed, Plansee did not invent the subject matter of the Asserted Patents because Plansee derived the invention from Bloom. Under 35 U.S.C. § 102(f), an applicant is not entitled to a patent if "he did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f). A derivation claim addresses the originality of the claims and the one attacking the patent must establish 1) "prior conception of the claimed subject matter" and 2) "communication the conception to the adverse claimant." *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993). There

must be a contemporaneous recognition and appreciation of the invention for there to be conception. *Silvestri v. Grant*, 496 F.2d 593, 596 (C.C.P.A. 1974).

176.    As discussed above, Mr. Couse is the true inventor of the subject matter claimed in each of the '785, '328, and '003 patents. █████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████.

177.    ██████████████████ on December 15, 2009, Plansee filed for Austrian Pat. Appl. No. AT7942009U.  Plansee then subsequently filed U.S. Appl. No. 12/969,067 on Dec. 15, 2010, which issued into the '785 patent, U.S. Appl. No. 14/204,500, which issued into the '328 patent, and U.S. Appl. No. 13, 435,762, which issued into the '003 patent, which each claim priority to the Austrian Pat. Appl. No. AT7942009U, and each of which████████████████████████

████████████████████████████████████ Accordingly, the Asserted Patents are invalid under 35 U.S.C. § 102(f) because the alleged invention was derived from Bloom.

178.    Accordingly, Bloom seeks declaratory judgment that the claimed subject matter was derived from Bloom.

## IV.    COUNT IV: DECLARATORY JUDGEMENT OF UNENFORCEABILITY OF THE PATENTS-IN-SUIT DUE TO INEQUITABLE CONDUCT

179.    Bloom incorporates herein the allegations of ¶¶ 1-178 and 201-438.

180.    An actual and justiciable controversy exists between Bloom and Plansee concerning the Patents-in-Suit.

181.    ███████████████████████████████████████████████████

██████████████████████████████████████████    ██████████████████

█████████████████████████████████████████████████████████

182.      The Patents-in-Suit are unenforceable due to inequitable conduct that occurred during the prosecution of their respective applications resulting in the issuance of the Patents-in-Suit.

183.      Marco Brandner, Stefan Gerzoskovitz, Wolfgang Kraussler, Alexander Leuprecht, and Andreas Venskutonis are named as alleged inventors on the face of the '785 and '328 patents and the Austrian Patent AT11799U1 to which they claim priority.

184.      Gebhard Zobl, Woflgang Glatz, Wolfgang Kraussler, and Robert Oberbreyer are named as alleged inventors on the face of the '003 patent and the Austrian Patent AT6260U1 to which it claims priority.

185.      In connection with prosecution of the Patents-in-Suit, Wolfgang Kraussler signed a declaration vouching for the content of the applications, in which he acknowledged his duty to disclose to the Patent Office information known to him to be material to patentability of the claims of the Patents-in-Suit in accordance with 37 C.F.R § 1.56.  Exhs. 5-7.

186.      In connection with prosecution of the '785 and '328 patents, Andreas Venskutonis signed a declaration vouching for the content of the applications, in which he acknowledged his duty to disclose to the Patent Office information known to him to be material to patentability of the claims of the '785 and '328 patents in accordance with 37 C.F.R § 1.56.  Exhs. 5 and 6.

187.      This duty of disclosure 117-118, includes disclosing the true inventors of the subject matter claimed in the Patents-in-Suit.  Inventorship is material to patentability under 37 C.F.R. § 1.56.

188.      As discussed above, Mr. Couse is an inventor of the Patents-in-Suit. ████████

████████████████████████████████████████████████████████████████████████████████

████████

189.     Despite knowing of Mr. Couse's contributions to the '785 and '328 patents, Messrs. Kraussler and Venskutonis breached their duty of disclosure by improperly omitting Mr. Couse as an inventor and failing to disclose Mr. Couse's contributions to the '785 and '328 patents.  And despite knowing of Mr. Couse's contributions to the '003 patent, Mr. Kraussler also breached his duty of disclosure by improperly omitting Mr. Couse as an inventor and failing to disclose Mr. Couse's contributions to the '003 patent.

190.     On information and belief, Messrs. Kraussler and Venskutonis intentionally breached their duty of disclosure and deceived the Patent Office so that Plansee could convert Mr. Couse's inventions.

191.     On information and belief, Plansee deliberately drafted the claims of the '003 patent in an attempt to ███████████████████████████████ knowing that the specification of the '003 patent does not support the alleged invention scope as now asserted by Plansee.  On information and belief, Plansee and the alleged named inventors purposely omitted Mr. Couse as an inventor so that the '003 patent could be asserted against Bloom and its suppliers.

192.     Mr. Kraussler deceptively claimed priority to the AT6260U1 Patent but drafted the claims of the '003 patent to capture inventions disclosed by Mr. Couse to Mr. Kraussler—which Messrs. Zobl, Glatz, Kraussler, and Oberbreyer had not actually invented.

193.     On information and belief, Messrs. Kraussler and Stemer, attempted to backdate the '003 patent by claiming priority to the AT6260U1 Patent in order to appear as if the claims of the '003 patent were invented prior to Mr. Couse's disclosures to Mr. Kraussler.

194.     On information and belief, Plansee deliberately drafted the claims of the '785 and '328 patents to target Bloom's ICs and the manufacturing thereof.  On information and belief,

Plansee and the alleged named inventors purposely omitted Mr. Couse as an inventor so that the '785 and '328 patents could be asserted against Bloom and its suppliers.

195.     On information and belief, Messrs. Kraussler and Venskutonis acted with specific intent to deceive the Patent Office by knowingly and deliberately (i) failing to list Mr. Couse as a co-inventor in order for Plansee to improperly claim ownership of the Patents-in-Suit; (ii) failing to disclose ███████████████████████████████████████████████████ ███████████████████████████████████████████████ the contributions of Mr. Couse, and (iii) inaccurately representing the claim limitations of the Patents-in-Suit as their own work.

196.     These facts would have been material to a reasonable examiner's consideration of inventorship.  The Patent Office would not have issued the Patents-in-Suit had the Patent Office known about Mr. Couse's contributions to the Patents-in-Suit.  Plansee—including Messrs. Kraussler, Venskutonis—knew this, and their misrepresentations to the Patent Office constitute egregious misconduct amounting to fraud and are thus material to patentability by their very nature.

197.     But for Messrs. Kraussler and Venskutonis' conduct described above, the Patent Office would not have issued the Patents-in-Suit.

198.     Bloom has standing to bring this claim at least because Plansee has accused Bloom of infringing the Patents-in-Suit, and Bloom has suffered and will continue to suffer injury in fact if Plansee is permitted to maintain its accusations despite the Patents-in-Suit being unenforceable.

199.     Bloom seeks a declaratory judgment under at least 28 U.S.C. §§ 2201 & 2202 from this Court that each of the Patents-in-Suit are unenforceable due to inequitable conduct that occurred during their prosecution.

## V.      COUNT V: DECLARATORY JUDGEMENT OF UNENFORCEABILITY OF THE PATENTS-IN-SUIT DUE TO PATENT MISUSE

200.      Bloom incorporates herein the allegations of ¶¶ 1-199 and 211-438.

201.      An actual and justiciable controversy exists between Bloom and Plansee concerning the Patents-in-Suit.

202.      ███████████████████████████████████████████

███████████████████████████████████   ████████████████

███████████████████████████████████████

203.      As discussed in above, each of Plansee's Messrs. Kraussler and Venskutonis made material misrepresentations to the Patent Office with the specific intent to deceive the Patent Office in connection with the Patents-in-Suit.  Despite knowing of Mr. Couse's contributions to the '785 and '328 patents, Messrs. Kraussler and Venskutonis breached their duty of disclosure by intentionally omitting Mr. Couse as an inventor and concealing Mr. Couse's contributions to the '785 and '328 patents.  And despite knowing of Mr. Couse's contributions to the '003 patent, Mr. Kraussler also breached his duty of disclosure by intentionally omitting Mr. Couse as an inventor and concealing Mr. Couse's contributions to the '003 patent.

204.      On information and belief, Plansee attempted to improperly extend the scope of the '785 and '328 patents beyond the monopoly conferred by the patent laws by claiming subject matter they did not invent, which was actually disclosed to them by Bloom's engineer, Mr. Couse—the true inventor.  More egregiously, Plansee also ███████████████████████ ███████████████████

205.      On information and belief, Plansee additionally attempted to improperly extend the scope of the '003 patent beyond the monopoly conferred by the patent laws by claiming subject

matter the alleged named inventors did not invent, which was previously disclosed by Bloom's engineer, Mr. Couse—the true inventor.

206.    On information and belief, Plansee also attempted to improperly extend the scope of the '003 patent beyond the monopoly conferred by the patent laws by claiming priority to the AT6260U1 Patent, which only discloses a two-step pressing process, and ███████████████ ████████████████████████████████████ that was actually invented by Bloom's engineer, Mr. Couse, and for which there is no written description or enablement in the '003 patent itself.

207.    Plansee attempted to use the Patents-in-Suit to convert Mr. Couse's inventions.

208.    On information and belief, despite knowing that the Patents-in-Suit were invalid, were procured through inequitable conduct, and were a conversion of Bloom technology, Plansee continued to assert these patents against Bloom and its suppliers intentionally and in bad faith, particularly as Bloom notified Plansee of Mr. Couse's prior contributions before it ██████ ██████████████████████████████

209.    Bloom has standing to bring this claim at least because █████████████ █████████████████████ and Bloom has suffered and will continue to suffer injury in fact if Plansee is permitted to maintain its accusations despite the Patents-in-Suit being unenforceable.

210.    Bloom seeks a declaratory judgment from this Court that each of the Patents-in-Suit are unenforceable due to Plansee's patent misuse.

## VI.    COUNT VI: DECLARATORY JUDGEMENT OF INVALIDITY OF THE '003 PATENT UNDER 35 U.S.C. § 112 FOR LACK OF WRITTEN DESCRIPTION AND/OR LACK OF ENABLEMENT

211.    Bloom incorporates herein the allegations of ¶¶ 1-210 and 217-438.

212.    An actual and justiciable controversy exists between Bloom and Plansee concerning the Patents-in-Suit.

213.   ████████████████████████████████████████████

████████████████████████████████   ████████████████

████████████████████████████████████

214.   The claims of the '003 patent are invalid under 35 U.S.C § 112 for lack of written description and/or enablement.  The '003 patent does not enable a person of ordinary skill in the art to make and use the claimed invention in which the pressing provides the density sufficient to render the interconnector suitable for use in a solid oxide fuel cell.  For example, the specification for the '003 patent does not provide an adequate written description under 35 U.S.C § 112 for at least the phrase: "the density is sufficient to render the interconnector suitable for use in a solid oxide fuel cell."

215.   Further, the specification does not enable a person of ordinary skill in the art to make and use the full scope of these claims without undue experimentation, particularly as to the lack of disclosure on a SPSS process.

216.   For the above reasons, Bloom seeks a declaratory judgement under at least 28 U.S.C. §§ 2201 & 2202 that the '003 patent is invalid.

## VII.   COUNT VII: DECLARATORY JUDGEMENT OF NON-INFRINGMENT OF THE PATENTS-IN-SUIT

217.   Bloom incorporates herein the allegations of ¶¶ 1-216 and 227-438.

218.   An actual and justiciable controversy exists between Bloom and Plansee concerning the Patents-in-Suit.

219.   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████

220.      Plansee  has  represented  that  Bloom  ███████████████████████

███████████████████████████████████████████████████████████

██████████████████    Therefore, Bloom cannot directly infringe the Patents-in-Suit for making,

using, selling, offering for sale, importing, or exporting the Accused Products.

221.      Plansee  has  ████████████████████████████████████████

███████████████████████████████████████████

222.      Bloom does not have any Accused Products ██████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

223.      Accordingly, regardless of whether the claims of the Patents-in-Suit read on the

Accused Products, Bloom cannot directly infringe the Patents-in-Suit because ████████████████

█████████████████████████████.

224.      ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████

225.      Because neither ████████████████  directly infringe, Bloom also cannot indirectly

infringe the Patents-in-Suit.

226.     For the above reasons, Bloom seeks a declaratory judgement under at least 28 U.S.C. §§ 2201 & 2202 that Bloom does not infringe—either directly or indirectly—the Patents-in-Suit.

## VIII.   COUNT VIII: DECLARATORY JUDGMENT OF NO MISAPPROPRIATION

227.     Bloom incorporates herein the allegations of ¶¶ 1-226 and 244-438.

228.     An actual and justiciable controversy exists between Bloom and Plansee concerning the alleged misappropriation of Defendants' alleged proprietary and confidential information, including alleged know-how.





233.

234.

235.

236.

237.

238.

239.

240.     Neither Defendant has identified any valid or enforceable proprietary and confidential information that Bloom could have misappropriated.

241.     Bloom has not misappropriated any proprietary and confidential information of either Defendant in violation of any state, federal, or other law.

242.     Accordingly, Bloom seeks a declaratory judgment that Bloom did not misappropriate any valid and enforceable proprietary and confidential information of Defendants.

243.     Bloom reserves all rights and defenses against the alleged misappropriation under applicable state, federal, or other laws.

### IX.     COUNT IX: UNFAIR COMPETITION

244.     Bloom incorporates herein the allegations of ¶¶ 1-243 and 255-438.

245.     As discussed in above, Bloom expended labor, skill, and money to research and develop ways of improving the manufacturing process of its fuel cell ICs.  At the time Bloom was still a fledgling startup and had developed a novel fuel cell stack that did not use precious metals, corrosive acids, or molten materials.  As a part of this process, Bloom spent considerable labor, skill, and money to develop ███████████████████████████.

246.     After great investment, Bloom succeeded in creating its first novel fuel cell stacks.

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Bloom

focused its labor, skill, and money on ████████████████████████████

██████████████████████████████████████████████████████████

███

247.     Bloom's efforts to ████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

248.     Bloom spent considerable labor, skill, and money to develop ██████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████ Building on Bloom's research and development of its fuel cells, Bloom also ████████████████████████████████████████████████ ██████████████████████████.

249.     ██████████████████████████████████ Plansee converted Bloom's designs by filing patents on them.  Plansee filed applications for multiple patents based on Bloom's designs, with the first application, Austrian Pat. Appl. No. AT7942009U, filed on December 15, 2009, and which later became the Austrian Patent AT11799U1.

250.     Plansee then filed for applications for patents ████████████████ ████████████████████████████████████████relying on the Austrian Patent AT11799U1 for priority.  The '785 patent and '328 patents also rely on the AT11799U1 patent for priority.

251.     ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████

252.     Again, Plansee converted Bloom's labor, skill, and research██████████████ ████████ Plansee filed the application for the '003 patent in 2012, which attempted to improperly enlarge the scope of the patent family to cover the SPSS process, when the '003 Family only discloses a two-step process.

253.     Now, Plansee is attempting to use the very same patents—the Patents-in-Suit, which contain converted inventions—to collect royalties ███████████████████████████ ████████████████ This is patent misuse. █████████████████████████████████

████████████████████████████ ██████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████

254.     Bloom has suffered and continues to suffer damages as a proximate result of Plansee's unfair competition.

### X.      COUNT X: TORTIOUS INTERFERENCE WITH CONTRACT

255.     Bloom incorporates herein the allegations of ¶¶ 1-254 and 264-438.

256.     Bloom has a contractual relationship ██████████████████████████.

257.     As discussed above, Defendants were aware of Bloom's contractual relationship █████████████████████████████.

258.     Defendants interfered with Bloom's contractual relationships by sending demand letters ███████████████████████. Defendants demanded ████████████████ ████████████████████████████████ under fraudulently obtained patents. Defendants claimed a license would be required ████████████████████████.

259.     On information and belief, Defendants specifically intended to harm the existing contractual relationships between Bloom ████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████.

260.     On information and belief, Defendants acted intentionally to interfere with ███████████████████████████████████████████████████████████████.

261.     On information and belief, Defendants acted intentionally to interfere with ██████ ███████████████████████████████████████████████.

262.     Defendants' demand for a license is neither privileged nor justified because their patents were obtained through fraud, ¶¶ 95-130; their attempts to enforce the Patents-in-Suit amounts to patent misuse, ¶¶ 131-137; and because Defendants' purported IP rights are based on converted Bloom technology.

263.     Bloom has suffered and continues to suffer damages—including injury to its business reputation—as a proximate result of Defendants' tortious interference with Bloom's and its suppliers.

## XI.     COUNT XI: BREACH OF CONTRACT

264.     Bloom incorporates herein the allegations of ¶¶ 1-263 and 281-438.

265.     As discussed above, Bloom entered ███████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████.

266.     Bloom performed all of its obligations █████████████████████████.

267.     Under the ██████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████.

268.     Furthermore, ███████████████████████████████████████

████████████████████████████████████████████████████████████

███████

269.     Pursuant to the ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████

270.     In accordance with Bloom's commitments ████████████████

███████████████████████████████████████████████████████.

271.     ████████████████████████ Bloom began to notice problems with the ICs

delivered by GTP. █████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

272.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

273.     However, despite Bloom's good faith efforts, Bloom could not remedy the issue █

████████████████████████████████████████████████████████████

████████████████████████████████ However, GTP did not make a good faith

effort to remedy the issue ████████████████████████████████████

-50-

274.     Accordingly, GTP breached the ███████████████████████████

████████████████████████████████████████████████████████████████

███████

275.     As a result, GTP failed to ████████████████████████████

276.     GTP continued to ████████████████████████████████████

████████████████████████

277.     GTP breached the duty of good faith and fair dealing ████████████

████████████████████████████████████████████████████████████████

███████

278.     On information and belief, GTP also breached ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

279.     On information and belief, such changes caused GTP ████████████

████████████████████████████

280.     As a direct and proximate result of GTP's breaches, Bloom suffered significant damages to replace the defective ICs and for being unable to even use the defective ICs because they would deteriorate too quickly.

## XII.     COUNT XII: BREACH OF WARRANTY

281.     Bloom incorporates herein the allegations of ¶¶ 1-280 and 298-438.

### A.     Breach of Warranty under the Supply Agreements

282.     As discussed above, Bloom entered into a ████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████

283.     Bloom performed all of its obligations under ████████████

284.     Under each of ████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████

285.     Pursuant to the ████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

286.     In accordance with Bloom's commitments ████████████████

████████████████████████████████

287.     ████████████████████ Bloom began to notice problems ██████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

288.     As a result, GTP failed to ████████████████████████.

289.     GTP continued to ████████████████████████████████

████████████████████

290.      Accordingly, GTP breached the warranties in ████████████████████

███████████████████████████

291.      As a direct and proximate result of GTP's breaches, Bloom suffered significant

damages to replace the defective ICs.

**B.     Breach of Warranty under the Purchase Orders**

292.      Bloom has issued numerous purchase orders (collectively, "POs") to GTP for the

purchase  of  GTP ████████████████████████████.     Attached,  hereto,  is  an

exemplary purchase order.  Exh. 18. ██████████████████████████

293.      GTP accepted the terms and conditions of each of the POs when it accepted each

of Bloom's POs. ████████████████████████████

294.      Under the POs, ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████

295.      As discussed above, GTP ████████████████████

████████████████████████████████

████████████████████████

296.      Accordingly, GTP breached the warranties ████████████████████

████████████████████████████████

████████████████████████████████

███████████████████

297.     As a direct and proximate result of GTP's breaches, Bloom suffered significant damages to replace the defective ICs.

### XIII.   COUNT XIII: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

298.     Bloom incorporates herein the allegations of ¶¶ 1-297 and 385-438.

299.     This Count is against Plansee and GTP.

300.     Plansee and GTP are a group of RICO persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise (the "PG Enterprise"), as described below.

301.     Plansee is associated with and participated in the conduct of the PG Enterprise described below through a pattern of racketeering activity for the unlawful and intentional purposes of converting Bloom technology, converting Bloom's Trade Secrets, and extorting Bloom and its suppliers for royalties on Bloom's ICs. In addition, Plansee and GTP conspired to monopolize the supply of ICs to Bloom.

302.     GTP is associated with and participated in the conduct of the PG Enterprise described below through a pattern of racketeering activity for the unlawful and intentional purposes of using Bloom's converted technology, extorting and defrauding Bloom and its suppliers for royalties on Bloom's ICs, and extorting Bloom to purchase GTP's defective products.

303.     The PG Enterprise is an association-in-fact enterprise engaged in and whose illegal activities affect interstate and foreign commerce, such as by converting Bloom technology, fraudulently procuring patents thereon, and fraudulently enforcing such patents.

304.     The PG Enterprise forms an association distinct from the separate operations of Plansee and GTP.  The association was formed for the common and continuing purposes of

converting Bloom technology, and extorting and defrauding Bloom and its suppliers for royalties on Bloom's ICs.

305.    Plansee and GTP each served different roles in the PG Enterprise, and, as described above and below, coordinated, implemented and carried out, formally and informally, the objectives of the association and different racketeering acts and other activities on an ongoing, continuous basis over many years.

306.    Plansee conducted and participated in the affairs of the PG Enterprise by, *inter alia*, contracting with Bloom, converting Bloom technology, fraudulently procuring patents on Bloom's technology, enforcing such patents, and conspiring with GTP as set forth below.

307.    GTP conducted and participated in the affairs of the PG Enterprise by, inter alia, conspiring to convert Bloom technology, manufacturing defective products to sell to Bloom, extorting Bloom to purchase its defective products by leveraging fraudulently obtained patents and conspiring to do the same.

308.    The PG Enterprise is currently ongoing and of sufficient duration to achieve its purpose, resulting in substantial ill-gotten gains and causing significant harm to Bloom and its suppliers.

309.    The PG Enterprise is continuous, has an ascertainable structure, and is distinct from the alleged predicate acts themselves.

310.    There may be other members of the enterprise who are unknown at this time, but which will be uncovered during discovery.

311.    Pursuant to and in furtherance of their scheme to convert Bloom technology and extort Bloom and its suppliers, Plansee and GTP each committed multiple acts and worked in concert together as the PG Enterprise, to commit multiple predicate acts of racketeering activity

as defined in 18 U.S.C. § 1961(1) on multiple occasions and in violation of multiple federal statutes, including the Economic Espionage Act (EEA), 18 U.S.C. § 1832, the federal Mail and Wire Fraud Statues, 18 U.S.C. § 1341 and 1343, and the Hobbs Act, 18 U.S.C. § 1951.

### A.   Bloom's Trade Secrets and Intellectual Property

312.      As discussed above, Bloom invested its labor, skill, and money ███████████

████████████████████████████████████████████.

313.      Bloom spent considerable labor, skill, and money into ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████ were Bloom's Trade Secrets.

314.      Bloom's proprietary know-how ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Collectively, all of this information also constituted Bloom's Trade Secrets.

315.      Bloom's Trade Secrets were subjects of reasonable efforts by Bloom to maintain their secrecy, especially given that Bloom was still a relatively young startup at the time. ███

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

316.    Bloom's Trade Secrets derived independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, others who could obtain economic value from the disclosure or use of the information. ██

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

317.    On information and belief, without Bloom's Trade Secrets, ██████████████ ████████████████████████ was not possible at the time, or would otherwise require considerable labor, skill, and money to develop.

318.    And indeed, Bloom had spent considerable labor, skill, and money to develop the Bloom Trade Secrets ███████████████████████████████████████ ████████████████████.

319.    Bloom Trade Secrets are related to Bloom's fuel cells, which are products and services used in and intended for use in interstate and foreign commerce.

**B.    Conspiracy to Convert Bloom's Intellectual Property, Defraud Bloom of its Trade Secrets, and related Predicate Acts**

320.     Plansee conspired with GTP to convert Bloom's Trade Secrets as their own—

████████████████████████████—and defraud Bloom of its intellectual property rights

("Conspiracy A").  This Conspiracy A is ongoing, continues to this day, and will continue in the

future.

321.     At various points in time, Plansee worked in concert with GTP as part of the

Conspiracy A to convert Bloom Trade Secrets and defraud Bloom of its intellectual property,

through intentional and unlawful means, in violation of the EEA 18 U.S.C. § 1832, et seq. and the

Mail and Wire Fraud Statutes 18 U.S.C. § 1341 and 1343.  Plansee and GTP took acts evidencing

their agreement to carry out such acts in furtherance of Conspiracy A.

322.     Throughout Bloom's relationship with Plansee and GTP, Bloom made it clear that

Bloom's ICs and their designs were solely Bloom's intellectual property.  ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

323.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

324.     At least by June 18, 2009, Messrs. Kraussler and Venskutonis knew that ████ ████ were invented by Mr. Couse and that ████████████████████ ████████████████████████████████████ ████. These designs and information were all Bloom's intellectual property and Bloom's Trade Secrets. Messrs. Kraussler and Venskutonis obtained this intellectual property and Bloom's Trade Secrets over wire communication.

325.     ████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████

326.     Conspiracy A began at least as early as April 1, 2010—████████ ████████████████████. As alleged herein, the activities reveal that Plansee and GTP agreed to use false and incomplete information to procure multiple domestic and foreign patents by improperly appropriating, replicating, transmitting, and communicating, all without authorization,  Bloom's Trade Secrets, including by purposefully omitting Mr. Couse as an inventor, as a part of Conspiracy A so that they would purport to have a monopoly over Bloom's ICs.  As part of Conspiracy A, Plansee and GTP desired to, and then attempted to, leverage Bloom's own Trade Secrets against Bloom and its suppliers such that GTP would secure and reap unwarranted financial gains and monopoly power over Bloom's ICs.

327.     ████████████████████████ ████████████████████████████████ ████████████████████████, Plansee filed and obtained domestic and foreign patents

that appropriated, replicated, and communicated Bloom's Trade Secrets without authorization —

███████████████████████████████████████████. Plansee misled the United States

Patent Office about the origin and use of the technology in these patents, as discussed above.

328.     Messrs. Kraussler and Venskutonis each knew that the rib designs disclosed and

claimed in the '785 and '328 patents were invented by Mr. Couse because ███████████

███████████████████████████████████████████. Mr. Kraussler also knew that the

SPSS process, ███████████████████████████ claimed in the '003 patent was also

invented by Mr. Couse for the same reason.  In furtherance of Conspiracy A, Messrs. Kraussler

and Venskutonis each breached their duty of disclosure before the United State Patent Office.

329.     For example, in furtherance of Conspiracy A, Plansee filed applications for the '785

and '328 patents on December 15, 2010 and March 11, 2014, respectively.  Given the history as

detailed herein, Bloom can only conclude that Messrs. Kraussler and Venskutonis purposefully

included Bloom's Trade Secrets in the patent applications and their claims and thereby falsely

represented (and concealed) Bloom's Trade Secrets as their own.  They participated with the

drafting of the claims so as to appropriate Bloom's Trade Secrets without prior notice to or

permission of Bloom.

330.     In furtherance of Conspiracy A, through wire communication and/or mail, Messrs.

Kraussler and Venskutonis, among many other wire communications in furtherance of the

conspiracy, submitted to the United States Patent and Trademark Office signed declaration of

inventorship that omitted Mr. Couse as an inventor during the prosecution of the '785 and '328

patents.  Exhs. 5 and 6.  Given the history, Messrs. Kraussler and Venskutonis did so intentionally

as part of Conspiracy A to mislead the United States Patent Office to obtain granted patents

concerning Bloom's IC's and trade secrets, but improperly owned solely by Plansee.

331.     Messrs. Kraussler and Venskutonis knew that the United States Patent Office would rely on their fraudulent declarations of inventorship.  Indeed, in reliance on Messrs. Kraussler and Venskutonis' fraudulent declarations of inventorship the United States Patent Office granted the '785 patent on June 18, 2014 and the '328 patent on August 12, 2014, but without naming Mr. Couse as inventor.

332.     The '785 and '328 patents purport to give Plansee patent rights over Bloom's Intellectual Property—including Bloom Trade Secrets.   Messrs. Kraussler and Venskutonis' fraudulent declarations also defrauded Bloom of patent rights that would otherwise be available if Mr. Couse was properly named as an inventor of the '785 and '328 patents.

333.     In furtherance of the conspiracy, Plansee committed wire fraud and mail fraud to accomplish the objectives of the PG Enterprise and in violation of 18 U.S.C. § 1341 and 1343, by, among other wire communications, fraudulently procuring each of the '785 and '328 patents to defraud Bloom of its intellectual property and convert Bloom's Trade Secrets.

334.     On information and belief, in furtherance of Conspiracy A, Plansee licensed the '785 and '328 patents to GTP.

335.     As another example, in furtherance of Conspiracy A, ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████   To that end, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ .

336.    In furtherance of Conspiracy A, Plansee filed the application for the '003 patent on March 30, 2012 in an attempt to improperly obtain patent claims covering Bloom's trade secret IC SPSS designs.  Given Plansee's improper attempts to secure alleged SPSS patent claims, GTP must have informed Plansee ███████████████████████████████████████ and shared Bloom's Trade Secret designs with Plansee.  Mr. Kraussler purposefully disclosed Bloom's Trade Secrets therein and participated with the drafting of the claims so as to appropriate and communicate Bloom's Trade Secrets without prior notice to or permission of Bloom.  Plansee and GTP specifically directed this appropriation at ████████████████████████ ██████████████████████.

337.    In furtherance of Conspiracy A, Mr. Kraussler, through wire communication and/or mail, submitted a signed declaration of inventorship that omitted Mr. Couse as an inventor during the prosecution of the '003 patent.  Exh. 7.  On information and belief, Mr. Kraussler did so intentionally as part of Conspiracy A to mislead the United States Patent Office and so that the granted patent would be owned solely by Plansee.

338.    Given the events, Mr. Kraussler must have intended that the United States Patent Office rely on his fraudulent declarations of inventorship.  In reliance on Mr. Kraussler's fraudulent declaration of inventorship the United States Patent Office granted the '003 patent on September 16, 2016.

339.    ██████████████████████████████████████████████ ████████████████████████████████████████████████  Mr. Kraussler's fraudulent declarations defrauded Bloom of patent rights that would otherwise be available if Mr. Couse was listed as an inventor of the '003 patent.

340.     On information and belief, in furtherance of Conspiracy A, Plansee licensed the '003 patent to GTP.

341.     On information and belief, Plansee used wire communications such as the internet and/or mail in furtherance of Conspiracy A by communicating with the United States Patent Office over the internet during the prosecution of each of the '785, '328, and '003 patents.

342.     As part of Conspiracy A, Plansee knowingly—without authorization—copied, duplicated, sketched, drew, altered, destroyed, and replicated Bloom's Trade Secrets, including when it filed the application for the '003 patent, in violation of the EEA § 1832(a)(2), constituting a distinct predicate act.  Plansee additionally transmitted, delivered, sent, mailed, communicated, and conveyed Bloom Trade Secrets, without authorization, to at least the United State Patent and Trademark Office in violation of the EEA § 1832(a)(2)..

343.     As part of Conspiracy A, Plansee knowingly converted and—without authorization—appropriated, took, and by fraud, artifice, and deception obtained Bloom's Trade Secrets for itself and GTP when it procured the '003 patent through fraudulent inventorship declarations in violation of the EEA § 1832(a)(1)..

344.     As part of Conspiracy A, Plansee furthered the objectives of the PG Enterprise and in violation of the Mail and Wire Fraud Statutes § 1341 and 1343, by procuring the '003 patent to defraud Bloom of its intellectual property—including Bloom Trade Secrets.

345.     As part of Conspiracy A, GTP knowingly received, bought, and possessed Bloom's Trade Secrets, knowing the same to have been appropriated, obtained, or converted without authorization with respect to each of the '785, '328, and '003 patents in violation of the EEA § 1832(a)(3).

346.      Further, as discussed, 320-345, Plansee and GTP each committed distinct acts in furtherance of the objectives of the PG Enterprise by conspiring with each other under Conspiracy A to violate the EEA § 1832(a)(1)-(5) and the Mail and Wire Fraud Statutes § 1341 and 1343.

**C.      Conspiracy to Extort and Defraud Bloom, █████████████ and related Predicate Acts**

347.      Bloom's ICs are an article of commerce and are components of Bloom's fuel cell stacks.  Bloom's fuel cell stacks are sold throughout the United States in interstate commerce.

348.      GTP and Plansee conspired to defraud Bloom of money for Bloom ICs through mail and wire fraud in violation of in violation of 18 U.S.C. § 1341 and 1343 and obstruct or affect commerce and the movement of articles or commodities in commerce—including Bloom's ICs— by extortion in violation of 18 U.S.C. § 1951(a) ("Conspiracy B").  This Conspiracy B is ongoing and continues to this day.

349.      GTP and Plansee also conspired to defraud ████████ ("Conspiracy C") and ██████ ("Conspiracy D") of money for Bloom ICs through mail and wire fraud in violation of 18 U.S.C. § 1341 and 1343 and obstruct or affect commerce and the movement of articles or commodities in commerce—including Bloom's ICs—by extortion in violation of 18 U.S.C. § 1951(a). Conspiracies C and D are both ongoing and continues to this day.

350.      In furtherance of Conspiracy B, █████████████████



351.      ████████████████████████



352. ███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████

353. ████████████████████████████████████████ In

furtherance of Conspiracy B, GTP denied there was a defect and did not work in good faith with

Bloom to remedy the issue.  GTP made baseless allegations, ████████████████████████

████████████████████████ GTP's claims were baseless, given that ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

354.        In view of GTP's disregard for its defective ICs and in furtherance of Conspiracy

B, the acts demonstrate that GTP knowingly manufactured defective products to gain a greater

profit for both GTP and Plansee including by spending less on its manufacturing.  Plansee must

have done so knowing that its fraudulently procured patents gave it additional leverage to continue

supply Bloom.

355.     Given the conspirators' independent acts for the PG Enterprise, and as part of Conspiracy B, the only conclusion is that Plansee and GTP planned to continue profiting from sales of the defective products to Bloom for as long as possible.  And when Bloom turned to other suppliers and stopped purchasing GTP's ICs, GTP continued the scheme by defrauding and extorting Bloom for an even greater windfall using the fraudulently procured '785, '328, and '003 patents.

356.     GTP clearly planned for and knew that in the event Bloom turned to other IC suppliers, GTP could attempt to leverage the fraudulently procured Plansee '785, '328, and '003 patents to Bloom's detriment.  In the scheme, GTP had no reason to fix its defective products and, indeed, never relayed any legitimate attempt to do so.

357.     On the other hand, Bloom was operating in good faith and had not realized until it was too late that multiple conspiracies were afoot and ongoing.  ███████████████████ ████████████████████████████████████████  In light of GTP's awareness and disregard of the defective products, GTP must have never intended to fix the defects in its ICs. GTP's acts and omissions concerning the defective products were in furtherance of Conspiracies A and B (including their respective distinct predicate acts), which each caused direct and proximate financial injury to Bloom.

358.     ██████████████████████████████████████████ ████████████—and in furtherance of Conspiracy B—████████████████████ ███████████████████, through wire and mail, claiming that Bloom ICs infringed the Plansee '785, '328, and '003 patents. Exh. 8.  In furtherance of Conspiracy B, GTP attempted to extort Bloom for royalties allegedly owed for Bloom's ICs under the fraudulently procured '785, '328, and '003 patents.

359.  ██████████████████████████████ GTP committed a distinct predicate act—in violation of 18 U.S.C. § 1341 and 1343 and the Hobbs Act, 18 U.S.C. § 1951(a), and in furtherance of Conspiracy B.

360.  In response, Bloom informed Mr. Walser, on January 27, that each of the '785, '328, and '003 patents were invalid and unenforceable.  Exh. 9.  ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████

361.  On February 5, 2021, attorney Daniel A. Kent, on behalf of both GTP and Plansee, responded to Bloom through wire and mail.  Exh. 10.  In furtherance of both Conspiracy A and Conspiracy B, GTP and Plansee ██████████████████████████████████

██████████████████████████.  In furtherance of Conspiracy A, through the February 5, 2021 letter, GTP and Plansee jointly attempted to further conceal the unauthorized appropriation and communication of Bloom's Trade Secrets and solidify the conversion of Bloom's Trade Secrets, which formed the basis for the '785, '328, and '003 patents.  In furtherance of Conspiracy B, GTP and Plansee also attempted to extort and defraud Bloom ████████████

████████████████████████████████████████

█████████████████████████████████

362.  By sending the February 5, 2021 demand letter, GTP and Plansee each committed a distinct predicate act—in violation of 18 U.S.C. § 1341 and 1343 and the Hobbs Act, 18 U.S.C. § 1951(a)—and was an overt act in furtherance of both Conspiracy A and Conspiracy B.

363.     On May 21, 2021, GTP and Plansee also jointly sent demand letters, through wire and mail, ███████████████████████████████████ stating that a license to the '785, '328, and '003 patents would be ██████████████████████████████████ ██████████████████████████████ Again, in furtherance of Conspiracy A, GTP and Plansee attempted to conceal from other suppliers and Bloom their conversion of Bloom's Trade Secrets through the '785, '328, and '003 patents.  In furtherance of Conspiracy C and Conspiracy D, GTP and Plansee attempted to extort and defraud ████████████████████████████ ██████████████████████████████████████████████ which are invalid, unenforceable, or otherwise should be at least partially owned by Bloom due to Mr. Couse's inventive contributions.

364.     By sending the May 21, 2021 demand letter ███████, GTP and Plansee each committed a distinct predicate act—in violation of 18 U.S.C. § 1341 and 1343 and the Hobbs Act, 18 U.S.C. § 1951(a)—and each was an overt act in furtherance of both Conspiracy A and Conspiracy C.

365.     By sending the May 21, 2021 demand letter ███████, GTP and Plansee each committed another distinct predicate act—in violation of 18 U.S.C. § 1341 and 1343 and the Hobbs Act, 18 U.S.C. § 1951(a)—and each was an overt act in furtherance of both Conspiracy A and Conspiracy D.

366.     Each of the May 21, 2021 demand letters ████████████████ was also an overt act in furtherance of Conspiracy B to further defraud and extort Bloom.

367.     Each demand letter, supra, 358, 361, and 363 attempted to use the wrongful threat of fear of economic loss to obtain an unwarranted financial windfall from █████████████████

368.



In this manner the conspiracies are ongoing and risk additional and greater financial and business injury to Bloom.

369.     Plansee and GTP each knew that their acts supra, 312-370, would injure Bloom and others.  Plansee and GTP's acts reflect a clear intent to purposefully deprive and monetize Bloom's Bloom Trade Secrets to Bloom's detriment and improperly interfere with Bloom's relationships with its suppliers.

370.     In addition, Plansee and GTP, and individuals known and unknown, violated the antitrust laws by improperly leveraging its ill-gotten patents to demand licenses, suppress competition, monopolize the market for Bloom's ICs and, in effect, illegally acquire control of ████████████████████.

371.     Further, as discussed, 347-371, Plansee and GTP each also committed a distinct predicate act in furtherance of the objectives of the PG Enterprise by conspiring with each other under each of Conspiracy B, Conspiracy C, and Conspiracy D to violate the Mail and Wire Fraud Statutes 18 U.S.C. § 1341 and 1343 and the Hobbs Act 18 U.S.C. § 1951.

372.     Bloom has been injured from the cost to replace GTP's defective products and inability to use its purchased defective products as a proximate result of Conspiracy A, a direct result of Conspiracy B, and a direct and proximate result of the PG Enterprise's ongoing pattern of racketeering activity.

373.     Each of these predicate acts, *supra*, 347-372, form a part of the PG Enterprise's ongoing pattern of racketeering activity and conspiracy.

### D.      Pattern of Racketeering Activity

374.     Each predicate act, 312-373, is interrelated, having the same or similar purpose, results, participants, victims, and methods of commission.

375.     These multiple illegal predicate acts occurred over many years and are ongoing to this day.  The illegal predicate acts alone and in combination achieved and furthered the deceptive and improper objectives of the PG Enterprise, to their benefit but at the expense of causing Bloom significant harm.

376.     Plansee and GTP's predicate acts are so numerous and pervasive that they show a specific threat of repetition extending indefinitely into the future and therefore constitute both a close-ended and open-ended pattern of racketeering.

377.     As a direct and proximate result of the pattern of racketeering activity, by and through each of the unlawful acts detailed above, Bloom's business and property in the United States has been injured, including, but not limited to, the loss of Bloom Trade Secrets, the loss of intellectual property rights in its proprietary technology (including Patent rights), damage to reputation, the cost of replacing GTP's defective products and inability to use the purchased products, ███████████████████████████████████████

### E.      RICO Conspiracy

378.     On information and belief, Plansee and GTP both conspired to commit two or more predicate acts in furtherance of their scheme in violation of 18 U.S.C. 1962(d) ("RICO Conspiracy").

379.     On information and belief, Plansee and GTP each joined the RICO Conspiracy knowing of its objective to conduct or participate, directly or indirectly, in the conduct of the PG Enterprise's affairs through a pattern of racketeering activity and intending to join together with at least each other to achieve that objective.  On information and belief, Plansee and GTP shared a unity of purpose and the intent to achieve the objective of conducting or participating in the conduct of an enterprise's affairs through a pattern of racketeering activity.

380.     In furtherance of their RICO Conspiracy, Plansee and GTP each committed various overt predicate acts of appropriation of trade secret, wire fraud, and mail fraud in relation to the procurement of the '785, '328, and '003 patents as discussed, *supra*, 312-373.

381.     In furtherance of their RICO Conspiracy, Plansee and GTP each committed various overt predicate acts of appropriation of trade secret, wire fraud, mail fraud, and extortion in relation to the demand letters ██████████████████████████ as discussed, *supra*, 312-373.

382.     In furtherance of their RICO Conspiracy, Plansee and GTP also committed various overt predicate acts by conspiring to commit various acts of acts of theft of trade secret, wire fraud, mail fraud, and extortion through each of Conspiracy A, Conspiracy B, Conspiracy C, and Conspiracy D.

383.     The PG Enterprise's RICO Conspiracy is currently ongoing resulting in substantial ill-gotten gains and causing significant harm to Bloom and its suppliers.

384.     As a direct and proximate result of the pattern of PG Enterprise's RICO Conspiracy, by and through each of the unlawful acts detailed above, Bloom has been injured in its business

and property within the United States, including, but not limited to: loss of Bloom Trade Secrets; loss of intellectual property rights (including Patent rights); damage to reputation; loss due to replacing GTP's faulty products; and loss from the inability to use the purchased products.

## XIV.   COUNT XIV: VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2 MONOPOLIZATION THROUGH WALKER PROCESS FRAUD

385.       Bloom incorporates herein the allegations of ¶¶ 1-384.

386.       This Count is against Plansee and GTP.

387.       Plansee and GTP used willful and exclusionary means as part of an overall scheme to improperly maintain and extend its monopoly power in the market of Bloom's SOFC ICs. Plansee and GTP accomplished its exclusionary scheme through *Walker Process* fraud and sham litigation.

388.       As described herein, Plansee and GTP undertook these monopolization acts with the specific intent to injure Plansee and GTP's competitors.

### A.       Plansee's Fraud Against The Patent Office

389.       Plansee obtained the '785, '328, and '003 Patents through knowingly and willfully misrepresenting facts to the United States Patent and Trademark Office.

390.       As discussed above, Plansee committed inequitable conduct before the United States Patent and Trademark Office, when prosecuting to issuance the Patents-in-Suit.  Plansee procured each of the '785, '328, and '003 Patents by preparing, submitting, and relying on before the United States Patent and Trademark Office multiple fraudulent declarations of inventorship.

391.       ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████.   Messrs. Kraussler and Venskutonis each breached their duty of disclosure before the United States Patent Office.

392.     On December 15, 2010 and March 11, 2014, Plansee filed applications that later issued intothe '785 and '328 Patents, respectively.  Given the timing of events as described above, Messrs. Kraussler, and Venskutonis purposefully pursued patent claims in an attempt to capture the proprietary and confidential ████████████████ invented by Mr. Couse.

393.     Messrs. Kraussler, and Venskutonis submitted a signed declaration of inventorship that omitted Mr. Couse as an inventor during the prosecution of the '785 and '328 Patents such that any granted patents would be owned solely by Plansee.  Exhs. 5, 6.

394.     Messrs. Kraussler and Venskutonis knew that the United States Patent and Trademark Office would rely on their false declarations of inventorship.

395.     In reliance on the false declarations, the United States Patent and Trademark Office granted the '785 Patent on June 17, 2014 and the '328 Patent on August 12, 2014.

396.     The '785 and '328 Patents would not have issued but for the false declarations of inventorship.

397.     GTP and Plansee allege that Bloom's rib designs infringe the fraudulently procured '785 and '328 Patents.  The false declarations defrauded Bloom of patent rights that would otherwise be available if Mr. Couse was listed as an inventor of the '785 and '328 Patents, as he should have been in the first instance.

398.     ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███ .

399.        Bloom infers from the events that, GTP must have informed Plansee that ███████

█████████████████████████████████████████████████████████████

because Plansee then filed for the '003 Patent on March 30, 2012.

400.        Plansee then filed for the '003 Patent on March 30, 2012, which had new patent

claims that GTP and Plansee now allege capture █████████████ invented by Mr. Couse.

401.        Mr. Kraussler submitted to the United States Patent and Trademark Office a signed

and false declaration of inventorship that omitted Mr. Couse as an inventor during the prosecution

of the '003 Patent such that any granted patent would be owned solely by Plansee.  Exh. 7.

402.        Mr. Kraussler knew that the United States Patent Office would rely on his false

declaration of inventorship.

403.        In reliance on the false declaration, the United States Patent Office granted the '003

Patent on September 16, 2016.

404.        The '003 Patent would not have been issued but for the false declaration.

405.        GTP and Plansee allege that ███████████████ infringe the fraudulently procured

'003 Patent.  The false declaration defrauded Bloom of patent rights that would otherwise be

available if Mr. Couse was listed as an inventor of the '003 Patent.

**B.    Plansee and GTP Efforts To Enforce The Fraudulently Obtained Patents**

406.        ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████ .

-74-

407.     Although it knew earlier as explained above, GTP and Plansee unequivocally knew that Plansee fraudulently obtained the the Patents-in-Suit on January 27, 2021, when Bloom explained in writing to Plansee and GTP that Bloom's employee should be an inventor of the Patents-in-Suit.  Exh. 9.

408.     Despite knowing that the Patents-in-Suit were fraudulently obtained by omitting an inventor and improperly converting and relying on Bloom's trade secrets, Plansee and GTP continued to demand royalties from Bloom ██████████████ alleged infringement of the Patents-in-Suit in an attempt to improperly create and extend Plansee and GTP's monopoly power over Bloom's IC market.  Exhs. 10, 11, 13-15.

409.     To further the monopolization effort over Bloom's IC market, on May 5, 2021, Plansee and GTP sent demand letters to Bloom ██████████████. Plansee and GTP attempted to collect royalties from Bloom ██████████████ ██ under the Patents-in-Suit.  Exh. 16-17.  Plansee and GTP's continuous attempts to license the fraudulently obtained Patents-in-Suit as well as monopolize and restrain trade in Bloom's SOFC IC market are "continuing violations" of the antitrust laws.

410.     Plansee and GTP's attempts to enforce the fraudulently obtained patents threatens to decrease competition in the relevant market for Bloom's ICs because patents are government-sanctioned exclusive rights that affect competition.

411.     Should Plansee and GTP succeed in their attempts to license the fraudulently obtained Patents-in-Suit Plansee and GTP will have successfully reduced their competition in Bloom's IC market because Bloom's other IC supplier's will either have to raise their prices or stop manufacturing ICs for Bloom.

**C.      Plansee and GTP Engaged** ███████████████

412. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████

413.      As discussed above, Plansee and GTP knew, that at least Mr. Couse is an inventor of the Patents-in-Suit.

414.      Plansee's improper exclusion of Mr. Couse as an inventor of each of the '785, '328, and '003 patents, as detailed above, render each of the '785, '328, and '003 patents invalid, unenforceable, or otherwise owned in whole or part by Bloom.

415. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

416. ████████████████████████████████████████

████████████████████████████ Plansee and GTP knew that they did not have standing to bring a patent infringement action against Bloom (given that Bloom is an owner of the patents and its trade secrets), but nevertheless proceeded to assert the patents against Bloom.

417.      Plansee and GTP's patent infringement claims, based on the fraudulently obtained Patents-in-Suit, and directly interfere with Bloom's ███████████████████. As discussed above, it was clear through this and GTP's subsequent demand letters that GTP's intent was to obtain financial gain from either more sales of ICs or a lump-sum payment. Exh. 10.

418.   ██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

419.   Based on the allegations above, ████████████████████████████

████████████████████████ in an attempt to further increase their monopoly power over Bloom's IC

market.

420.   Bloom has been injured in business and financial forms, including consequence and

expenses that flow from Plansee and GTP's unlawful ████████████████████████████

██████████████████████████████████████

**D.   Plansee and GTP's Actions Show a Clear Intent to Monopolize**

421.   As discussed above, Plansee fraudulently obtained the Patents-in-Suit, through

intentional misrepresentations and omissions made to the United States Patent Office.

422.   As discussed above, Plansee and GTP attempted to collect royalties from Bloom

on the fraudulently obtained Patents-in-Suit.

423.   As discussed above, Plansee and GTP attempted to license the Patents-in-Suit to

████████████████.

424.   As discussed above, Plansee and GTP ████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████

425.   The goal, purpose and effect of Plansee and GTP's scheme was to reduce their

competition in the market for Bloom's ICs.

426.     Bloom is the proper entity to bring this claim because ███ and GTP's attempts to achieve monopoly power have been and continue to be directed to Bloom █████████ █████████.

427.     The relevant geographic market for sales and the destination of goods is the United States, where the U.S. patents are enforceable.

428.     The relevant product market is that of Bloom's ICs. ████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████

429.     Plansee and GTP's attempts to achieve monopoly power are with respect to Bloom's IC market ████████████████████████████ █████████.

430.     Plansee and GTP's actions present a dangerous probability of achieving monopoly power, because the fraudulently obtained patents nonetheless have a presumption of validity as they were granted by the federal government, albeit only in view of significant fraud.

431.     Plansee and GTP have acted with specific intent to monopolize Bloom's IC market by fraudulently obtaining the Patents-in-Suit, attempting to collect royalties on the patents from

Bloom, ███████████████████████████   ████████████████████

████████████████████████████████████████████████████████

432.     Through the anticompetitive scheme, Plansee and GTP intentionally and wrongfully attempted to achieve monopoly power with respect to Bloom's ICs in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

433.     Bloom has been injured in its business and property by Plansee and GTP's anticompetitive, unfair and deceptive acts alleged in detail above.  Had Plansee and GTP been successful in their attempts to achieve monopoly power, as discussed above, Bloom would have had to pay higher prices for its ICs than it would have paid absent Plansee and GTP's anticompetitive actions.

434.     As a result of Plansee and GTP's attempts to achieve monopoly power, Bloom was induced ████████████████████████████████████████████████

████████████████████.  As discussed above, the defective ICs cost Bloom a considerable amount of money.

435.     Further, Bloom has incurred and will continue to incur attorney fees that flow directly from Plansee and GTP's infringement suit against Bloom based on the fraudulently obtained Patents-in-Suit, as well as this present suit that Plansee and GTP necessitated through their monopolistic and anticompetitive activities against Bloom, ███████████████.

436.     Bloom will continue to face injury if Plansee and GTP are allowed to continue their attempts to achieve monopoly power by enforcing the fraudulently obtained Patents-in-Suit with the specific intent to monopolize Bloom's IC market.

437.     Plansee and GTP's unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

438.     Bloom is entitled to recover treble damages, costs, reasonable attorney fees, and interest under § 4 of the Clayton Act, 15 USC § 15.

## INJUNCTIVE RELIEF

439.     Bloom has been damaged by Defendant's misuse of fraudulently obtained patents, unfair competition, tortious interference, racketeering, and anti-competitive conduct and will continue to be damaged unless Defendant is enjoined by this Court.

440.     Bloom has suffered and continues to suffer irreparable injury.

441.     The balance of hardships favors Bloom.

442.     Further, the public interest is served by an injunction, at least because Defendant's anticompetitive conduct affects the affordability of green energy available to the public.

## EXEMPLARY DAMAGES

443.     Defendant's acts, including racketeering among the many others, have been willful and with malice toward Bloom, and Bloom further seeks exemplary damages against Defendant in the maximum permitted amount, including up to three times the amount of Bloom's actual damages, attorney's fees, and costs pursuant to the applicable laws, including Section 18 U.S.C. § 1964(c).

## ATTORNEY'S FEES

444.     Bloom is informed and believes, and thereon alleges, that Defendant's conduct was willful and malicious based on the facts alleged herein.  Defendant acted with a purpose and

willingness to commit the acts alleged and its conduct was not reasonable under the circumstances. Bloom is therefore entitled to exemplary damages, attorney fees, and costs.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Bloom Energy Corporation respectfully requests that the Court enter judgment against all defendants as follows:

a.  Correction of inventorship for the Patents-in-Suit or a declaratory judgment that the Patents-in-Suit are invalid;

b.  A declaratory judgement that the Patents-in-Suit are unenforceable;

c.  A declaratory judgement that GTP failed to ████████████████████
   ████████

d.  For actual damages in an amount to be proven at trial;

e.  Restitution, unjust enrichment, and a refund from Defendant resulting from its breach of contract, breach of warranty, and defective ICs;

f.  Exemplary and punitive damages;

g.  Treble damages as provided in 18 U.S.C. §§ 1964(c) and 1964(d);

h.  Reasonable attorneys' fees and costs;

i.  Pre-judgment and post-judgment interest at the maximum rate allowed pursuant to statutory and common law; and

j.  For such other and further relief as the Court deems appropriate, just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff Bloom hereby demands trial by jury on all claims

and issues so triable.

DATED:     April 3, 2022           Respectfully submitted,


*/s/ Yar R. Chaikovsky*
**PAUL HASTINGS LLP**
Yar R. Chaikovsky
CA Bar #175421 (Admitted E.D. Tex.)
yarchaikovsky@paulhastings.com
Philip Ou
CA Bar #259896 (Admitted E.D. Tex.)
philipou@paulhastings.com
Bruce Yen
CA Bar #277920 (Admitted E.D. Tex.)
bruceyen@paulhastings.com
Radhesh Devendran
CA Bar #318517 (*pro hac vice* to be filed)
radheshdevendran@paulhastings.com
1117 S. California Avenue
Palo Alto, California  94304-1106
Telephone: (650) 320-1800
Facsimile: (650) 320-1900

**PAUL HASTINGS LLP**
Jeff Pade
jeffpade@paulhastings.com
VA Bar # 45725 (*pro hac vice* to be filed)
2050 M Street NW
Washington, D.C., 20036
Telephone: (202) 551-1700
Facsimile: (202) 551-1705

**THE DACUS FIRM**
Deron Dacus
TX Bar No. 00790553
ddacus@dacusfirm.com
821 ESE Loop 323, Suite 430
Tyler, TX 75701
Telephone: (903) 705-1117
Facsimile: (903) 581-2543

***Attorneys for Plaintiff Bloom Energy Corp.***

-83-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 5, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

*/s/ Yar R. Chaikovsky*
Yar R. Chaikovsky
